**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| | |
| v. | 1:21-CR-0027-AJT |
| | |
| ADIAM BERHANE, | |
| | |
| Defendant. | |

## DEFENDANT'S POSITION ON SENTENCING

From conduct to conviction, this case has spanned a decade. Adiam Berhane is a much different person at fifty years old than she was at forty. In the last ten years, many significant events have impacted and changed her as a person. Ms. Berhane has lived in limbo this entire time, only now with a resolution on the horizon. She hopes the Court will consider the information in this brief and in the character letters attached.

There are a variety of reasons, discussed below, to sentence Ms. Berhane to 60 months of confinement. Granted, she has experience with the courts and with jail, but at fifty she is tired. Abraham Lincoln once wrote, "I have found that mercy bears richer fruit than strict justice." Although below her calculated guidelines, 60 months will be sufficient, but not greater than necessary, to achieve justice in this matter.

## BACKGROUND

Ms. Berhane was indicted on March 2, 2021 with an eleven count indictment charging various fraud offenses. She appeared in this Court for trial on December 5, 2022. On December 9, 2022, she was found guilty by a jury on all counts. Ms. Berhane appears in this Court for sentencing on March 15, 2023.

## The Road Away from Acceptance

The Arlington Police Department arrested Ms. Berhane and Mr. Clark Donat in the pre-dawn hours of October 28, 2016.  She was arrested in the parking garage of her apartment building outside of her vehicle, as the Arlington Police executed search warrants on her apartment, her coffee shop in the Roslyn neighborhood, and her family's home in Washington, DC.  Her mother ran a family daycare out of her family's home.  Both she and Mr. Donat were arrested on four warrants charging two counts of money laundering and two counts credit card fraud.  Ms. Berhane was initially held without bail by the Arlington General District Court.

On November 14, 2016, Ms. Berhane petitioned the Arlington Circuit Court for bail, which was granted on the condition of a $250,000 secured bond, by cash or corporate surety.  Following that ruling, the Commonwealth's Attorney appealed the Circuit Court's Order granting bail to the Court of Appeals of Virginia.[1]  For a secured bond of this magnitude, this type of appeal by the Commonwealth was strange and very uncommon.  Furthermore, the Commonwealth requested the Circuit Court stay its Order on bail pending their appeal, which the Circuit Court initially granted, but then lifted after a few weeks.

Ms. Berhane remained in custody until the Court lifted the stay, after which her family used their family home as collateral for her bail.  Ms. Berhane was in custody in the Arlington jail from October 28, 2016 to December 16, 2016, a total of 50 days.  Mr.

---

[1] The Court of Appeals denied the Commonwealth's appeal by Per Curiam Decision dated January 17, 2017 (CoA Record #1908-16-4).

Donat appeared in front of a different judge than Ms. Berhane and did not receive bail.

On March 13, 2017, Ms. Berhane appeared in the Arlington General District Court for a preliminary hearing on her four felony charges. Mr. Donat waived his preliminary hearing. The Commonwealth presented evidence on the four charges, which took a little over an hour, and then the judge found probable cause and bound the charges over to the grand jury that same day. On April 24, 2017, the Commonwealth's Attorney indicted Ms. Berhane with 55 felonies. The Commonwealth indicted her co-defendant, Mr. Clark Donat, with 10 felonies. The only difference in the procedural posture of their cases was that Ms. Berhane had obtained bail and she had gone through a preliminary hearing.

Mr. Donat pleaded guilty to all 10 felonies for which he was indicted. He was told they were representative of the conduct for which the Commonwealth's Attorney believed he was responsible. When Ms. Berhane inquired about a plea agreement, the Commonwealth's Attorney informed her that she could plead guilty to 20 felonies, out of the 55 for which she was indicted. The number of felony counts in Ms. Berhane's plea offer was chosen arbitrarily. When questioned about the large disparity in treatment between Ms. Berhane and Mr. Donat, the Commonwealth's Attorney referenced her preliminary hearing and a motion requesting return of some personal items as indicative of her lack of acceptance of responsibility. Ms. Berhane did not accept that plea offer.

Over the next two and a half years, Ms. Berhane's trial date was continued many times for a variety of reasons. Eventually, one month before the Arlington Commonwealth's Attorney lost her re-election, the case was transferred the U.S. Attorney's Office for the Eastern District of Virginia in approximately October 2019. The

Commonwealth then moved to dismiss the 55 felony indictments.  The experience with the Arlington Commonwealth's Attorney definitely affected Ms. Berhane's view of whether she would ever get fair treatment.  As noted above, she was indicted by the U.S. Attorney's Office in March 2021.

<u>**OBJECTION TO THE SENTENCING GUIDELINES**</u>

Ms. Berhane objects to the computation of the loss amount as the "intended loss," PSR ¶ 62, and to the application of the "Special Rule" loss calculation in U.S.S.G. § 2B1.1, cmt. n.3(F)(i).  PSR ¶ 51.  Rather, Ms. Berhane's loss amount should be calculated using the actual losses of $528,931.  USSG 2B1.1(b)(1).  This results in a guidelines enhancement of 12 points on the loss table, as opposed to the additional 16 points calculated by probation under the "intended loss" rubric.

In arriving at the meaning of any sentencing guideline, this Court begins its examination of a given guideline's plain meaning "by examination of its language, structure, and purpose."  *United States v. Hawley*, 919 F.3d 252, 255 (4th Cir. 2019).  Indeed, "[i]t is the text, of course, that takes precedence, and so that is where [this Court] begin[s]."  *United States v. Shell*, 789 F.3d 335, 340 (4th Cir. 2015) (declining the Government's invitation to "skip[] past the text of [the Guideline in question] to focus on its commentary").

After determining the precise meaning of a given guideline, the sentencing Court must, under a preponderance standard, find that the evidence supports any enhancement.  *See United States v. Grubbs*, 585 F.3d 793, 803 (4th Cir. 2009) ("[p]reponderance of the evidence is the appropriate standard of proof for sentencing

purposes"); *United States v. Noe*, 191 Fed. Appx. 216 (4th Cir. 2006) (district court's use of preponderance of evidence standard in making factual findings supporting sentencing enhancements was constitutional).

### 1. Loss Amount—U.S.S.G. § 2B1.1 and Special Rule (3)(F)(i)

The applicable guideline to Ms. Berhane's offense is U.S.S.G. § 2B1.1.  This guideline for economic crimes starts with a base offense level of 7.  U.S.S.G. § 2B1.1(a)(1).  The guideline then lists a variety of offense characteristics that can affect this offense level.  Relevant here, sentencing courts increase the offense level in incremental amounts based on the "loss" resulting from the offense.  *Id.* § 2B1.1(b)(1).  These incremental amounts are expressed in terms of monetary "loss" and range from adding two levels for a "loss" of "[m]ore than $6,500," *Id.* § 2B1.1(b)(1)(B), through adding 30 levels for "loss" amounts of more than $550,000,000, *Id.* § 2B1.1(b)(1)(P).  Separately, Application Note 3(F) to § 2B1.1 states that "[n]otwithstanding subdivision (A), the following special rules *shall be* used to assist in determining loss ...." U.S.S.G. § 2B1.1 cmt. n.3(F) (emphasis added).  Subsection (i) requires that "[i]n cases involving any counterfeit access device or unauthorized access device, loss ... *shall not* be less than $500 per access device."  *Id.* § 2B1.1 cmt. n.3(F)(i) (emphasis added).

The term "loss" is not defined in the Guideline itself.  *See* § 2B1.1(b)(1).  However, as shown below, the common understanding of the term "loss," as well as an examination of the history and structure of § 2B1.1(b)(1), establishes "loss" is not ambiguous.  The inclusion of "intended loss" in the calculation of loss in the instant case is unsupported by the plain text of the guideline.

In 1984, Congress passed the Sentencing Reform Act ("SRA") which created the Sentencing Commission. The Commission was tasked with creating "guidelines" that contain sentencing ranges for federal offenses. 28 U.S.C. §§ 994(a)(1), (b)(1); *Stinson v. United States*, 508 U.S. 36, 40-41 (1993). In creating the Sentencing Commission, Congress included several statutory procedural safeguards to act as checks on the sentencing rules promulgated by this Commission. The Commission is required to submit the Guidelines to Congress for its review at least six (6) months prior to the enactment or amendment of any Guideline. *See* 28 U.S.C. § 994(p). Congress also required that amendments to the Guidelines go through notice-and-comment rulemaking. 28 U.S.C. § 994(x). Moreover, each set of Guidelines also includes "application notes" in the "commentary" that "may serve a number of purposes," U.S.S.G. § 1B1.7, including "interpret[ing] the guideline[s] or explain how [they] [are] to be applied." *Id.*

In *Stinson*, the Supreme Court held that the Guidelines are "equivalent of legislative rules adopted by federal agencies." *Stinson*, 508 U.S. at 45. The Court viewed the commentary to the Guidelines as "akin to an agency's interpretation of its own legislative rules." *Id.* The Court, citing, *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414 (1945), held that the Commission's commentary interpretation of a guideline "must be given 'controlling weight unless it is plainly erroneous or inconsistent with the'" guideline. 508 U.S. at 38. Following this, in the 2019 case of *Kisor v. Wikie*, 139 S. Ct. 2400 (2019), the Supreme Court curtailed its broad deference to agency interpretations of regulations and held that the *Seminole Rock* standard should only be applied by courts

when a regulation is genuinely ambiguous.  139 S. Ct. at 2414.  However, the *Kisor* court

cautioned that before deciding whether a regulation is ambiguous, "a court must

carefully consider the text, structure, history, and purpose of a regulation, in all the ways

it would if it had no agency to fall back on."  *Id*. at 2415 (internal citations omitted).

As previously stated, U.S.S.G. § 2B1.1 does not define the term "loss."  *See Id*. §

2B1.1(b)(1).  While the term "loss" is not specifically laid out, it is plainly evident that

"loss" is measured by the actual amount of money lost or stolen.  *See Id.* §

2B1.1(b)(1) ("If the loss exceeded $6,500, increase the offense level as follows ....").

Statutory terms that are not defined are "interpreted as taking their ordinary,

contemporary, common meaning."  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227

(2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir.

2020).  In attempting to define the term "loss," as used in § 2B1.1, the Third Circuit in

*United States v. Banks* noted:

> "One dictionary defines the word to mean, among other things, the "amount of
> something lost" or the "harm or suffering caused by losing or being lost." *American
> Heritage Dictionary of the English Language* 1063 (3d ed. 1992). Another says it can
> mean "the damage, trouble, disadvantage, [or] deprivation ... caused by losing
> something" or "the person, thing, or amount lost." *Webster's New World College
> Dictionary* 799 (3d ed. 1996). A third defines it as "the being deprived of, or the
> failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the
> "[d]iminution of one's possessions or advantages," or the "detriment or
> disadvantage involved in being deprived of something[.]" 9 *Oxford English
> Dictionary* 37 (2d ed. 1989)."

55 F.4th 246, 258 (2022) (citing *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir.

2021).  Indeed, as succinctly stated by the *Banks* court, these "common dictionary

definitions of 'loss' point[s] to an ordinary meaning of 'actual loss.'  None of [the]

definitions suggest an ordinary understanding that 'loss' means 'intended loss.'"  55 F.4th at 258.[2]

This commonsense reading of "loss" as actual loss is further reinforced when reading other subsections § 2B1.1 in which the Guideline's plain text references the concept of "intended activity."  *See* U.S.S.G. § 2B1.1(b)(14) ("If the offense involved a misappropriation of a trade secret and the defendant knew or *intended*...) (emphasis added); *id.* § 2B1.1(b)(18)(A) ("If the defendant was convicted of an offense under 18 U.S.C. § 1030, and the offense involved *an intent* to obtain personal information ....") (emphasis added).  As such, it is plainly evident that the omission of "intended loss" in § 2B1.1(b)(1)'s text was intentional.  *United States v. Haas*, 986 F.3d 467, 489 (4th Cir. 2021) (noting that "when language is used in one part of a Guideline provision and not in another, the exclusion is presumed intentional.").

The Fourth Circuit, in *United States v. Campbell*, while determining that the plain text of U.S.S.G. § 4B1.2(b)—the definitional guideline for the Career Offender enhancement—was inconsistent with the Commission's Commentary to that Guideline, warned of the "far-reaching influence of agencies and the opportunities such power carries for abuse" if their interpretations of their own regulations go unchallenged by

---

[2] The Fourth Circuit has reserved Judgement on the precise meaning of "loss" as used in § 2B1.1 and the applicability of *United States v. Banks*, 55 F.4th 246 (3d Cir. 2022).  *See United States v. Limbaugh*, 4th Cir. No. 21-4449, 2023 WL 119577 (4th Cir. Jan. 6, 2023) ("To be clear, we take no position on the underlying merits of [Defendant]'s claims, and it may be that these three cases [*Banks* being among them] represent the beginning of what will become a consensus view that at least some of the commentary to § 2B1.1 "sweeps more broadly than the plain text of the Guideline."

courts.  22 F.4th 438, 446 (4th Cir. 2022).  Indeed, the Fourth Circuit expounded on its

warning by stating that:

> "These concerns are even more acute in the context of the Sentencing Guidelines,
> where individual liberty is at stake. The Supreme Court has long held that "defining
> crimes and fixing penalties are legislative, not judicial, functions." *United States v.
> Evans*, 333 U.S. 483, 486 (1948). And although the Court has held that the
> Sentencing Guidelines do not violate this separation of powers, that is so because
> of the checks on the Sentencing Commission's authority. *United States v. Mistretta*,
> 488 U.S. 361, 393–94 (1989) ("Whatever constitutional problems might arise if the
> powers of the Commission were vested [solely in the Judiciary], the Commission is
> not a court ... and is not controlled by or accountable to members of the Judicial
> Branch."). In fashioning the Sentencing Guidelines, "the Commission is fully
> accountable to Congress, which can revoke or amend any or all of the Guidelines
> as it sees fit," and the Commission's "rulemaking is subject to ... notice and comment
> requirements[.]" *Id.  In contrast, in fashioning commentary the Commission acts
> unilaterally, without that continuing congressional role so vital to the Sentencing
> Guidelines' constitutionality*. Thus, a holding that "the commentary can ... add to
> [the Sentencing Guidelines'] scope" would "allow circumvention of the checks
> Congress put on the Sentencing Commission, a body that exercises considerable
> authority in setting rules that can deprive citizens of their liberty." *Nasir*, 982 F.3d
> at 159, aff'd on remand, 17 F.4th 459.

*Id*. at 446 (emphasis added).  In Ms. Berhane's case, such a holding would allow the

commentary to impermissibly add to the scope of the Sentencing Guidelines by

artificially driving up the loss amount, using a fictitious "loss" calculation, in order to

punish her more harshly for her crimes than had her guidelines level been calculated

using the actual losses that resulted.

Simply put, the text of 2B1.1 is unambiguous, and as such, the commentary

expanding its definition to included "intended loss" is inconsistent with the Guideline

and, under the rule laid down by the Supreme Court in *Stinson* and *Kisor*, should be

afforded little to no weight.  *United States v. Campbell*, 22 F.4th 438, 443 (4th Cir. 2022)

("The Supreme Court's caution [] that commentary to the Sentencing Guidelines is

authoritative unless it violates the Constitution or a federal statute, *or is inconsistent with*, or a plainly erroneous reading of, that guideline[.]") (emphasis added); *Id.* at 444 ("[t]he Supreme Court has reiterated that defining the same key term in different ways, such that one definition includes a category that the other definition does not, renders those two definitions "inconsistent.").

### 2. *The Application Note assigning $500 per access device number lacks an empirical basis.*

Section 2B1.1's Special Rule found in Comment (3)(F)(i) is fundamentally flawed as it is not based on empirical evidence or national experience—as mandated by Congress.  Specifically, U.S.S.G. § 2B1.1, cmt. n.3(F)(i) provides that $500 be automatically applied to every unauthorized access device—in this case 3,756 access devices—and that the resulting dollar amount would represent the "loss" for the given offense.  Simply put, this "Special Rule" is an entirely arbitrary and archaic.

When Congress enacted the Sentencing Reform Act of 1984, it ordered the Commission to establish guidelines that "assure the meeting of the purposes of sentencing," 28 U.S.C. §991(b)(1)(A), and to use average sentences and incarceration time actually served in the pre-guidelines period as a "starting point."  28 U.S.C. § 994(m).  The Commission was then directed to continually review and revise the guidelines in light of sentencing data, criminological research, and consultation with frontline actors in the criminal justice system.  *See* 28 U.S.C. § 991(b)(1)(C), § 991(b)(2), § 994(o), § 995(13), (15), (16).

In *Rita v. United States*, 551 U.S. 338, 350 (2007), the Supreme Court discussed two reasons that it may be "fair to assume" that the guidelines "reflect a rough

approximation of sentences that might achieve § 3553(a)'s objectives."  First, the original Commission used an "empirical approach" which began "with an empirical examination of 10,000 presentence reports setting forth what judges had done in the past."  Second, the Commission is able review and revise the guidelines based on judicial response through sentencing judgments, and consultation with other interest groups and experts. *Id*. at 348-50.

However, when the Commission established the guidelines in 1987, it "decided to abandon the touchstone of prior past practice" with respect to white collar offenses. Justice Stephen Breyer, *The Federal Sentencing Guidelines and the Key Compromises Upon Which They Rest*, 17 Hofstra L. Rev. 1, 23 (1988).[3]  The Commission prescribed at least a form of confinement for all but the least serious cases, and established a fraud guideline that required no less than 0-6 months and no more than 30-37 months for defendants in Criminal History Category I.  *See* USSG § 2F1.1 (1987).  The Commission explained that "the definite prospect of prison, though the term is short, will act as a significant deterrent to many of these crimes, particularly when compared with the status quo where probation, not prison, is the norm."  USSG, ch. 1, intro., pt. 4(d) (1987).

This deterrence-based rationale was not supported by empirical evidence. Research on white-collar defendants shows no difference between the deterrent effect of probation and that of imprisonment.  *See* David Weisburd et al., *Specific Deterrence in a*

---

[3] Available at
http://scholarlycommons.law.hofstra.edu/cgi/viewcontent.cgi?article=1630&context=hlr, (last accessed Feb 28, 2023).

*Sample of Offenders Convicted of White Collar Crimes*, National Institute of Justice Report at 21-25 (1994) ("It has often been assumed by scholars and policy makers that white collar criminals will be particularly affected by imprisonment.  Our findings provide evidence that this assumption is wrong, at least as regards reoffending among those convicted of white collar crimes in the federal courts.") [hereinafter Specific Deterrence].[4]  Furthermore, "[T]here is no decisive evidence to support the conclusion that harsh sentences actually have a general and specific deterrent effect on potential white-collar offenders.  In fact, when criminal sanctioning was found to have such an effect, it was accompanied by informal sanctions (such as social censure, shame, and loss of respect) which were equally important in producing the deterrent outcome."  Zvi D. Gabbay, *Exploring the Limits of the Restorative Justice Paradigm: Restorative Justice and White Collar Crime*, 8 Cardozo J. Conflict Resol. 421, 448-49 (2007) (emphasis added).

Indeed, with regard to Application note (F)(i) specifically, when the Guidelines were originally promulgated in 1987, this application note prescribed a minimum of $100 per unauthorized access device.  *See* 1987 USSG §2B1.1, Application Note 4.[5]  The basis for this original $100 was unclear.  The access device amount was then amended in 2000 in response to a 1998 directive from Congress.  *See* Amend. No. 596 (Nov. 1, 2000), amending USSG §§ 2B1.1, 2F1.1.  The directive instructed the commission to evaluate in part, "the extent to which the value of the loss caused by the offenses (as

---

[4] Full report available at https://www.ncjrs.gov/pdffiles1/Digitization/151296NCJRS.pdf, (last accessed Feb 28, 2023).
[5] Available at https://www.ussc.gov/sites/default/files/pdf/guidelines-manual/1987/manual-pdf/Chapter_2_A-C.pdf  (last accessed Feb 28, 2023).

defined in the Federal sentencing guidelines) is an adequate measure for establishing penalties under the Federal sentencing guidelines;" *See* Section 2 of the Wireless Telephone Protection Act, Pub. L. 105–172 ("WTPA")).

The Commission published a working group report setting forth its findings with respect to Congress' directive and the resulting amendments.  USSC, Cellular Telephone Cloning (2000).[6]  This working group report showed that the Treasury Department sought an increase to $1,000 per access device.  In support of this request, the Treasury Department cited a 1999 study of credit card industry data that showed approximately $1,000 average fraud loss per card.  Instead of adopting the $1,000 per access device, however, the Commission simply split the difference:

> "[I]increasing the minimum to $1,000 per device could be problematic in another way. In cases in which loss for one or more pairs is determined to be less than $1,000, using a $1,000 per pair minimum for other pairs within the same case could be inappropriate. This problem would not likely occur if the current $100 minimum was retained. For those who argue that the $100 amount is too low for access devices, an amount somewhere between $100 and $1,000 might be less problematic."

*Id*. (Cellular Telephone Cloning) at 8.  Thus, not only was this change not based on empirical evidence at the time, the "evidence" it did have is now drastically outdated.

However, even putting aside the drastically outdated data that the current guideline is based on, the data would still be off with respect to the guideline provision because it likely does not factor in its average all the access device numbers that may have been stolen, but never touched, or expired numbers, or access devices that are

---

[6] Available at https://www.ussc.gov/sites/default/files/pdf/research/working-group-reports/intellectual-property-and-tech/20000125-cell-phone-cloning/clonexs.pdf (last accessed Feb 28, 2023).

otherwise unusable.  Yet, the guidelines require that the loss include these credit card numbers even if they are expired or otherwise unusable.  *See* U.S.S.G. §2B1.1, cmt. n.3(A)(ii).

Given that Application note (F)(i) to §2B1.1 falls far short of Congress' mandate to craft guidelines that are empirically based, as demonstrated above, this Court should afford it no weight whatsoever.  *See United States v. Kimbrough*, 552 U.S. 85, 109-10 (2007) (When a guideline "do[es] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case").  Judge Underhill said this best in *United States v. Corsey*, "Because the plan was farcical, the use of intended loss as a proxy for seriousness of the crime was wholly arbitrary:  the seriousness of this conduct did not turn on the amount of intended loss any more than would the seriousness of a scheme to sell the Brooklyn Bridge turn on whether the sale price was set at three thousand dollars, three million dollars, or three billion dollars.  By relying unquestioningly on the amount of the intended loss, the District Court treated this pathetic crime as a multi-billion dollar fraud—that is, one of the most serious frauds in the history of the federal courts."  723 F.3d 366, 378-79, (2d Cir. 2013) (Underhill, D.J., concurring).

## ARGUMENT ON SENTENCING FACTORS

Since the Guidelines were held to be advisory in *United States v. Booker*, 543 U.S. 220, 226 (2005), imposing a sentence is no longer a strictly mathematical exercise.

While "a district court shall first calculate (after making the appropriate findings of fact) the range prescribed by the guidelines," *United States v. Hughes*, 401 F.3d 540, 546 (4th. Cir. 2005), district courts must now make "an individualized assessment based on the facts presented" after calculating the advisory Guidelines range. *Gall v. United States*, 552 U.S. 38, 50 (2007).

The Guidelines range is but one of several factors a court must consider when imposing a sentence and it is legal error to treat those ranges as default sentences. *See United States v. Mendoza-Mendoza*, 597 F.3d 212, 216-17 (4th Cir. 2010); *Nelson v. United States*, 555 U.S. 350, 352 (2009) (per curiam); *Spears v. United States*, 555 U.S. 261, 263-64 (2009). A court must also weigh the factors enumerated in 18 U.S.C. § 3553(a) when imposing a sentence.

Considering the factors enumerated in § 3553(a), which state that a judge must "'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing," *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)), courts are not required to point to "'extraordinary' circumstances to justify a sentence outside the Guideline range." *Gall v. United States*, 552 U.S. 38, 47 (2007). A below-Guidelines sentence may be appropriate if the Court determines that the Guideline sentence "falls outside the 'heartland' to which the Commission intends individual Guidelines to apply, perhaps because the Guidelines . . . fails to properly reflect § 3553(a) factors." *Rita v. United States*, 551 U.S. 338, 351 (2007)(citation omitted).

The factors for the district court to consider include:  (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the

need for the sentence imposed; (3) the kinds of sentences available; (4) the Sentencing

Guidelines; (5) pertinent policy statements issued by the Sentencing Commission; (6)

the need to avoid unwarranted disparities among similar offenders; and (7) the need to

provide restitution to victims.  18 U.S.C. § 3553(a).  The Court must weigh each of these

factors when determining the appropriate sentence with the least amount of

imprisonment necessary pursuant to §3553(a).  *Id*.

## The Nature and Circumstances of the Offenses

Admittedly, the fraud in this case was brazen and callous.  But a few points are

worth noting.  First, none of the people victimized in this case suffered any actual losses.

In most cases, the credit card companies had contacted them almost immediately to

reverse any unauthorized purchases.  Second, Ms. Berhane's actions did not drastically

affect any of the victims' lives.  Although her actions surely impacted several large

companies, they were more of a minor inconvenience to the regular people involved.

And obviously, there was no violence involved of any kind.  Lastly, it is worth noting that

the Government has turned eight instances of misconduct into eleven by charging the

same conduct in counts 4 through 6 and counts 7 though 9.[7]  Moreover, although they

address the same conduct, the latter counts each carry a two-year mandatory minimum,

which the Court must impose.

## Personal History and Characteristics

Ms. Berhane was born in Eritrea and her family left shortly after her birth.  Her

---

[7] This argument addresses fundamental fairness; it is not a double jeopardy argument pursuant to *Blockburger v. United States*, 284 U.S. 299 (1932) or its progeny.

family fled the war-torn country during its long war of independence.  They settled in Italy for a short time.  Ms. Berhane and her family then immigrated to the United States in 1982.  They settled in the Washington, D.C. area.  Her parents opened and operated a small, family restaurant for a few years before their divorce in the late 1980s.

Ms. Berhane's father was not involved with the family after his divorce.  Her mother was the only constant in her life.  Ms. Berhane was young but still acted as a *de facto* second parent when her siblings were born.  She took on much responsibility at a young age and clearly stepped up for her family, which she has done over and over in her life.  If there is a theme to Ms. Berhane's personal background, she has been a good, reliable, and steady family member.

Ms. Berhane developed her work ethic from being around her mother as a young girl.  She was able to see her mother attempt to start businesses—failing at some and succeeding at others.  This sparked Ms. Berhane's entrepreneurial spirit and creativeness.  She was able to see first-hand what one can accomplish in the United States with a strong work ethic.  And while it is sad to think about how Ms. Berhane has used her opportunities, her work ethic has remained.  She has continued to work, and work hard, during the entire ten-year duration of her "pre-trial" proceedings.

Generally, Ms. Berhane is in poor health physically and emotionally.  She suffers from several medical conditions, but she primarily suffers from constant pain due to being hit by a car in December 2018.  Her accident has also made it difficult for her to move and exercise.  Due to all of this, Ms. Berhane has gained a substantial amount of weight since these allegations came to light.  Additionally, her mental health is poor.

Obviously, this is partially due to the stress and anxiety of essentially being a defendant for seven years.  However, the death of Ms. Berhane's mother in 2019 has taken the biggest toll on her mental health.  That her mother died while these allegations were pending causes Ms. Berhane extreme heartache and pain.  Ms. Berhane's responsibility for this situation simply makes it more difficult.

Ms. Berhane's criminal history is not very long, but the offenses are similar in nature to the instant offenses.  She has also had issues on probation.  However, the longest sentence that Ms. Berhane has received was 40 months of confinement almost twenty years ago.  That was 2003 when Ms. Berhane was thirty years old.  Surely, increasing her punishment to 60 months would be sufficient, but not greater than necessary, to deter a fifty-year-old woman.

### The Need for the Sentence Imposed

A sentence of 60 months is the longest period of incarceration that Ms. Berhane has ever served.  Pursuant to the sentencing statute, a defendant's sentence should be designed:

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner[.]

18 U.S.C. § 3553(a)(2).  A sentence of 60 months will certainly reflect the seriousness of her offense.  Moreover, it will deter others and protect the public from access device fraud.  With respect to specific deterrence, Ms. Berhane will express to this Court the remorse and embarrassment she feels and what she has learned from this long event.

Additionally, as the Second Circuit noted, a defendant who has previously been sentenced to minimal incarceration, might very well be deterred by a lesser amount of incarceration than someone who has shown themselves to be undeterred by a lengthy sentence. *See United States of America v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001). Ms. Berhane's longest period of confinement before this case was 40 months. Therefore, an increase by 50% of that punishment to a 60-month sentence represents a substantial jump from anything she has experienced.

The research shows that lengthier prison sentences do not prevent recidivism. "[H]aving pulled together the best available evidence, we have been persuaded that prisons do not reduce recidivism more than noncustodial sanctions." Francis T. Cullen et al., *Prisons Do Not Reduce Recidivism: The High Cost of Ignoring Science*, 91 Prison J. 48S, 50S-51S (2011). "Among low-risk offenders, those who spent less time in prison were 4% less likely to recidivate than low-risk offenders who served longer sentences. Thus, when prison sentences are relatively short, offenders are more likely to maintain their ties to family, employers, and their community, all of which promote successful reentry into society. Conversely, when prisoners serve longer sentences, they are more likely to become institutionalized, lose pro-social contacts in the community, and become removed from legitimate opportunities, all of which promote recidivism." Valerie Wright, *Sentencing Project, Deterrence in Criminal Justice: Evaluating Certainty v. Severity of Punishment* (2010).[8]

---

[8] Available at https://webpage.pace.edu/jhumbach/Crim-SentencingProject%20ReportonDeterrence.pdf (last accessed March 8, 2023).

Even the Sentencing Commission itself acknowledged this fact.  "There is no correlation between recidivism and guidelines' offense level.  Whether an offender has a low or high guideline offense level, recidivism rates are similar." U.S. Sent'g Comm'n, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (2004).  And perhaps most notably, the Department of Justice has tacitly acknowledged this fact:  "[C]onfinement or increased length of incarceration served the crime control purpose of incapacitation but had little or no effect as a 'treatment' with rehabilitative or specific deterrent effects."  Don M. Gottfredson, U.S. Department of Justice, National Institute of Justice, *Effects of Judges' Sentencing Decisions on Criminal Cases*, Research in Brief 9 (Nov. 1999).

In accordance with § 3353(a), a sentence of 60 months is sufficient, but not greater than necessary, to reflect the seriousness of the case and achieve the Court's goals of specific and general deterrence.

### The Sentencing Guidelines

The Sentencing Guidelines range should be viewed critically against Ms. Berhane's actual culpability and a downward variance in this case is warranted.   Should the Court sustain Ms. Berhane's objection to the guidelines calculation, her sentencing range would be between 100 and 125 months.  This is still an inflated level for strictly financial crimes.  A sentence of 60 months is appropriate considering all of the sentencing factors in § 3553(a).

## CONCLUSION

Ms. Berhane respectfully requests that the Court impose a sentence of 60 months confinement, with credit for the 50 days she served in the Arlington jail.

Respectfully submitted,
ADIAM BERHANE
By Counsel


_____/s/_____
Yancey Ellis (VSB 70970)
Counsel for Defendant
108 N. Alfred Street, First Floor
Alexandria, Virginia 22314
703.684.7908
yancey@carmichaellegal.com


## CERTIFICATE OF SERVICE

I hereby certify that on March 8, 2023, I filed the foregoing pleading through the ECF system, which shall then send an electronic copy of this pleading to all parties in this action.

_____/s/_____
Yancey Ellis

21

# ATTACHMENT


# CHARACTER LETTERS



**To: The Honorable Anthony Trenga**

Albert V. Bryan U.S. Courthouse
401 Courthouse Square
Alexandria, VA 22314

**Dear Judge Trenga,**

We are Debbie Berhane and Heyab Berhan, the younger siblings of Adiam Berhane. With sentencing of our sister approaching, we wanted to respectfully offer Your Honor insight into our family and Adiam's life over the past 7 years.

Some of our very first memories are of Adiam being by our side. Adiam was about 10 years old when she moved to the US. Being an immigrant in the early 80's was hard and our family encountered many challenges. Despite Adiam's young age, being just 11 when the first of us (Debbie) was born, Adiam took on roles in our lives that not many siblings do. Adiam would prep and take us to school, grocery shop for the family, read and do homework with us, take us to appointments (when she was old enough) and a host of other things as she supported our family through its many changes. Adiam became a critical source of support as our mom became a single parent and solely responsible for raising us in a country she barely knew. When the youngest of us (Heyab) was born with cerebral palsy and asthma, Adiam did all she could to help ease the stress our mom was under as she fought to give her baby boy the best chance at a fulfilling life. It has been because of the joint support of our mom and Adiam that we are thriving young adults, and we are forever indebted to our sister for the role she didn't have to take, but did.

Adiam has endured much over the past several years, the most heartbreaking of which has been the passing of our mom, Tsegreda Thare. In November of 2017, our mom was diagnosed with Stage 4 Ovarian Cancer and she passed away 16 months later - mom was just 64 years old. Losing our mom has been the greatest heartbreak of our lives. Our mother was an integral part of us, and took care of us until the very end, even cooking Christmas dinner just 6 weeks before her passing. Since mom's passing, Adiam has stepped into her role in our lives. She is our counsel, keeps cultural traditions alive in our family, supports her nephews, Marcus and Sebastian, as they navigate college and pre-school, and so much more.

Though moms passing still affects us all each day, we feel it has been the hardest on Adiam who endured much of life's challenges along side mom. And while Adiam has never expressed this to us, we know she carries a weight on her heart about how the actions she's taken affected our mom and her health. We pray every day for God to heal Adiam's heart and for her to know how much mom loves her and wants the best for her life.

Right before moms passing, Adiam was struck by a car while walking, suffering significant leg trauma. She still deals with the physical and emotional effects of the trauma and the related surgeries.

Enough has happened in these last few years to cause anyone to give up hope. Despite her significant emotional and physical struggles, Adiam has pushed through and has continued to love and support her community in any way she can. One of the most important roles Adiam plays is in supporting the home-based childcare program our mom left behind. Adiam has been a teacher to over 20 of our youngest citizens and continues to aid in this critical service to the families in our community. Adiam enriches the lives of the families we serve in many ways including cooking meals, offering guidance for young families, and so much more. Adiam's critical role in our home-based program cannot be replaced leaving the future of the daycare unknown. Adiam also works closely with a non-profit organization that supports people with disabilities and their families.

Though much of our experiences have been shared, each of us has our own personal perspective to offer Your Honor about Adiam. We will share those individually below.

**From Heyab:**

Second only to mom, Adiam has been the most important source of support for me from childhood all the way into my adult life. As a young man with cerebral palsy, I have had roughly 7 orthopedic surgeries since I was born. Additionally, I've been hospitalized and in the ER due to having severe childhood asthma and allergic reactions.

Adiam has been there through most, if not all of those experiences, to care for me while I was bedridden or hospitalized. Whether it was providing me with food, keeping me company by watching my favorite movies with me or making sure I'm following doctors orders, Adiam has always been there. Countless doctors appointments, physical therapy sessions and hours of personal time devoted to helping me with school work among many other things I'm sure I may forget to mention. As I plan my next orthopedic surgery, I struggle to think how I will make it through without her.

Without the foundation that she has provided, it is fair to say that I likely would not be as successful in adulthood as I have been. I work for local government as a vocational counselor for high school students with disabilities. Some of my essential duties are providing guidance and counseling to young adults who need help with planning out their careers. In many cases, I have also been fortunate enough to be able to assist my clients with navigating college affectively and providing a significant number of them with scholarship funding. As a result, I have been able to make an impactful change in the lives of hundreds of kids in my 9 years of work in the field of disability supports.

I believe that it is reasonable to say without Adiam I may not have gotten to the point where I am able to do such impactful community work. So much so that in my work I often cite my sisters as a reference for what ideal family support looks like.

She's been a wonderful source of love and stability to me as well as our nephews, Marcus and Sebastian, and I hope that she will one day be there to provide the same love and support my children when I become a father someday.

**From Debbie:**

I am the mother of 2 amazing sons - Marcus Anthony (18) & Sebastian Aurelius (5). Marcus is a wonderful young man who is in his freshman year of college at North Carolina A&T where he is studing international management, continuing with his Chinese language (fluent) and thriving. Sebastian is a funny and smart boy in PreK-4 at Washington Yu Ying. I'm not sure how I can express the impact that Adiam has had on the lives of my sons. I was just 21 when Marcus was born and absolutely leaned on the support of my family as I finished college. I was a bit seasoned by the time Sebastian was born in 2017, but this time I couldn't lean on my mom for help as she was in the fight for her life. Adiam has been a nurse, teacher, chauffeur, comforter, study partner, party planner, cheerleader, and so much more to my sons. Their lives wouldn't be what they are without her.

To my little one she is "modiam" (that is mom + Adiam, his attempt at expressing his relationship with her). To my young man, she is the person who exposed him to the beauty and history of our cultures, both American and Eritrean, and encouraged him to be great in everything he does. Adiam is a core part of my sons lives, and they will certainly be at a loss without her.

To me, Adiam is the one who held my little hand all the way to the grocery store, and carried me (and the many groceries) all the way back home. Adiam is the closest thing I have to a parent now and to think of her not being able to be at my wedding (I'm recently engaged) breaks my heart.

Your Honor, we are aware of how significant of a sentence Adiam is facing. We hope that we have been able to offer Your Honor a glimpse of who Adiam is outside of the offenses she has committed, and that you will find her life and work to warrant a lower sentence.

It is our hope that through this letter we have been able to lift Adiam up, as she has done for us all our lives.

Respectfully,

Debbie Berhane & Heyab Berhan

To: The Honorable Anthony Trenga

Albert V. Bryan U.S. Courthouse

401 Courthouse Square

Alexandria, VA 22314

March 8, 2023


Dear Judge Trenga,

We are Richard Battaglia and Leigh Sutherland, friends of the Berhane family and Adiam Berhane for over 20 years. With sentencing of Adiam approaching, we wanted to respectfully offer Your Honor some insights into our family's relationship with the Berhane family and the closeness we have developed with Adiam Berhane over the years.

Our oldest daughter, Alex Battaglia, is 35 years old and has a severe genetic disability, Angelman's Syndrome. She has seizures, no spoken language, and very poor balance. Because of that, Alex was fortunate to be part of the Gudelsky Swim program at the Rockville JCC. They have a staff physical therapist and many wonderful volunteers. This is where I met Heyab Berhan, Adiam's youngest brother. Heyab has cerebral palsy and was a client at the program. I became his coach after my daughter Alex learned to swim.

The bond between Heyab and myself developed quickly and soon it expanded to a close and productive relationship between all members of our family and the Berhanes.  Heyab and Adiam's mother, Tsegreda Thare, was an amazing person, giving the best and thoughtful care to all her children and seeking out the best doctors and therapies for Heyab. She ran an infant day care center from her home along with Adiam and her other daughter Debbie.  The respect and devotion of the families whose children were served there was deep and appreciative.  Both Debbie and Adiam were wonderful caregivers. Adiam was especially helpful in caring for and assisting with my daughter Alex when our families were together or when we needed urgent assistance in caring for Alex. Adiam was caring, attentive and trustworthy in all the care she gave Alex along with our 2 younger sons. We could always trust her implicitly.

I do not know all the details of the immigrant struggles that the Berhane family went through, but I do know the war in Eritrea had a profound impact on Adiam especially.  But this is strong family with much love to give, and Adiam has been the anchor of the family, both in the early days after arrival, and most recently.

Your Honor, we know the significance of the sentence that Adiam has to come to terms with.  I hope my wife Leigh and I have given you a glimpse into the strong and caring character we know Adiam to possess.  We believe that the offenses she has committed are totally out of character for Adiam, and she still is the caring, attentive and affectionate person that cared for my children and family in our times of need.  We hope that you will consider her family and all the people that she has helped and consider a lower sentence where she can continue to be useful to her family and community.


Respectfully,

Richard J. Battaglia

Katherine Leigh Sutherland



**Yancey Ellis <yancey@carmichaellegal.com>**

___

## Fwd: Letter for Adiam
1 message

___

████████████████████████                                    Wed, Mar 8, 2023 at 11:08 AM
To: Yancey@carmichaellegal.com

Sent from my iPhone

Begin forwarded message:

> **From:** Jonathan Brhane ████████████████
> **Date:** March 8, 2023 at 11:02:31 AM EST
> **To:** ███████████████████
> **Subject: Letter for Adiam**
>
> To Whom it May Concern:
>
> I've known Adiam Berhane to as be an organized, responsble and very compassionate person. She has always been active in our community, donating her time & money to various charities locally & abroad in Africa.
>
> Adiam is an extremely well read, strong willed & hard working individual, finishing undergrad in three years with a double major of History & Political Science. She has gone out of her way to help myself & many others more times than I can count.
>
> I am aware of the seriousness of this situation but I can vouch for her character & capabilities. I'm absolutely positive that she can be an asset to society if given another chance. I respectfully plead for as much leniency possible. Thank You.
>
> If you have any further questions, please feel free to contact me by phone or email.
>
> Regards,
> Jonathan Brhane
> ██████████████

March 7, 2023

Jacquelyne Pryor

████████████████

To the Honorable Anthony Trenga,

My name is Jacquelyne Pryor and I work in higher education. I have known Adiam over 30 years. She has always been a genuine and very caring person encouraging to family and friends, and caring for the community.

In elementary school, I was always in awe of Adiam's kindness and graciousness and her love for her family, heritage and community. I learned first hand the depth of the her kindness and that of her family in my Junior and Senior year in high school, when my mother, my brother and I suddenly became homeless. My mother and brother went to my mother's friends house, but there wasn't enough room for me, and graciously, the Berhane family allowed me to live with them so that I could finish out my studies. In the home, I was no different than the other younger siblings, with homework and chores and with a big sister to encourage your dreams and let you know anything was possible.

I attended cultural events where Adiam opened my eyes to a rich and vibrant history and legacy, of which she supported and is proud. My shortcomings didn't matter to her, my limited understanding of life, given my age didn't matter to her, she freely and willingly opened her heart and cared for me like a big sister.

As I grew into adulthood she encouraged me, letting me know that there was so much room for me to grow in my career and as a person, and that my first job would not be my forever job and to just keep at it and keep going!

She cared deeply for my eldest child, and was proud as I married and continued my family. Adiam cared for me at my lowest point, she took the time to encourage me to build me up. She's loved on my family and showed that same kindness to them and countless others. Her character, her heart is genuine and loving. I am forever grateful for her kindness, encouragement and love as she is the big sister that I always wanted.

Sincerely,

Jacquelyne Pryor



The **DC**
**Center** for
**INDEPENDENT**
**Living**
**Breaking down**
**Barriers**

Richard A. Simms
Executive Director

March 8, 2023

Dear Honorable Anthony Trenga –

It is with both pleasure and sadness that I submit this letter on behalf of Adiam Berhane. I have known Adiam for almost 2 decades. Adiam has worked for me in a couple of capacities at the DC Center for Independent Living (DCCIL). DCCIL is a 501(c)3 community based non-profit organization that helps people with significant disabilities live independently in their homes and communities in Washington, DC.

When DCCIL received a significant amount of money from the CARES Act to help people with disabilities avoid homelessness, hunger and isolation, I hired Adiam to be an outreach specialist. She was hired because she has a lifelong experience of a family member with a disability, she can communicate in several languages, she has a thorough knowledge of the DC area and she is an intelligent and caring young lady. As outreach specialist, she was responsible for locating organizations that serve people with significant disabilities and whose programs would be in jeopardy from the impact of COVID were it not for additional funding. She located several programs including SOME (So Others Might Eat), the Eritrean Cultural Civic Center, the DC Office on Aging's Older Individuals Who Are Blind program, The Family Place and several food banks that needed support during this crisis. The DC Center for Independent Living was able to distribute over $150,000 to these organizations as well as personal protective equipment. In addition to this, Adiam assisted our Independent Living Specialist in distributing grocery cards to those experiencing food insecurity. It can be easily and readily said that we were able to do this because of Adiam's energy and tireless effort to locate organizations and individuals serving people with disabilities who were in dire need.

Currently, Adiam works as a consultant for DCCIL supporting our Public Health outreach efforts and was instrumental in the Centers ability to hold a very successful event entitled, "Health & Wellness Forum: Disability Access & You" which took place on March 2, 2023. Adiam continues to be a team member and serve on DCCIL's Public Health committee, connecting individuals with disabilities to community-based health organizations. Hopefully she will be able to remain a valuable team member throughout the duration of this grant.

It saddens me that one with so much talent and ability has become entangled in the criminal justice system when her talents and gifts could be better used for the good of society. Should

Main Office
2600 12th Street, NE, Washington, DC 20018
**Voice:** 202-388-0033 **Fax:** 202-398-3018
**Website:** www.dccil.org

Anacostia Satellite
840 Chesapeake St, SE, Washington, DC 20032
**Voice:** 202-889-5802 **Fax:** 202-889-1159



The **DC**
**Center** for
**INDEPENDENT**
**Living**
**Breaking down**
**Barriers**

Richard A. Simms
Executive Director

you have any questions, please feel free to contact me either by cell phone at 202-841-7260 or my office landline at 202-388-0033.

Thank you so much for hearing me out.


Respectfully,

Richard A. Simms, MA, MPA
Executive Director


Main Office
2600 12th Street, NE, Washington, DC 20018
**Voice:** 202-388-0033 **Fax:** 202-398-3018
**Website:** www.dccil.org

Anacostia Satellite
840 Chesapeake St, SE, Washington, DC 20032
**Voice:** 202-889-5802 **Fax:** 202-889-1159

March 7, 2023

To The Honorable Anthony Trenga

Dear Judge Trenga,

We are Adiam Berhane's 3 aunties along with our 93 year old mother. When Adiam was 4 years old, a war break up in our country and our sister Tsegreda (Adiam's mom) was forced to emigrate for work and leave Adiam with us for some time. During this period of her young life, Adiam witnessed many hardship, often having to go with us to stand in a long line to get just one loaf of bread. It was at this early age in life that Adiam learned a great deal of compassion and care! This compassion continued to grow with her. Adiam is happy only when she is in a position to help especially her family. Her beloved mom, her sister and brother, her nephews, her cousins, us her aunties and her friends have always been treated with so much love and care.

After the passing of our sister, Adiam put aside her own pain in order to support her brother, sister and nephews in any way that she can, on top of working at the daycare center which was previously run by our late sister. Adiam is also a great support to our mother, her 93 years old grandma, who she makes sure to connect with her on a daily basis and it makes her days easier! It is with great humility that we are asking Your Honor to consider giving our niece/daughter a chance to redeem herself and we as family will be part of her positive progress.

Thank you for your time,
Elizabeth, Almaz, Ascalu and Grandma Tsehaitu