IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) Criminal No. 1:21-CR-27 |
| v. | ) |
| | ) The Honorable Anthony J. Trenga |
| ADIAM BERHANE, | ) |
| | ) Sentencing: March 15, 2023 |
| *Defendant.* | ) |
| | ) |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

Adiam Berhane is a recidivist fraudster who has been committing nearly the same crime for almost 30 years. Her extensive criminal history, her involvement in multiple forms of fraud, and her history of utter disregard for the law (including while under prior court supervision), show that she will not stop committing carding fraud unless and until the Court forces her to stop. Based on her track record, the only way to do this is through a lengthy period of imprisonment that far exceeds any one of the multiple felony fraud sentences that she has received to date. In addition, the government requests that the Court impose the maximum period of supervised release. The government also requests a special condition that Berhane be barred from any employment where others must rely on her integrity and honesty, including in financial matters, such as assisting others with applications for government loans or anything remotely connected to handling money.

The revised Presentence Investigation Report ("PSR," ECF No. 105) calculates the Guidelines range as 151 to 188 months with a statutory range of 2 to 196 years of imprisonment. The Guidelines offense level stated in the PSR should be increased by two points because of the use of device-making equipment in the offense, for an ultimate Guidelines range of 188 to 235 months.

The United States requests that the Court sentence the defendant to an aggregate prison

sentence of 212 months (188 months for the Guidelines counts consecutive to 2 years for the aggravated identity theft counts). The United States also requests that the Court impose the maximum possible term of supervised release with the special condition described above, full restitution to victims, forfeiture of the device-making equipment used in connection with these crimes, and special assessments as required by statute. This sentence is necessary to protect the public from further crimes committed by Berhane, to adequately reflect Berhane's sophistication and her crimes' impact on victims, to reflect the level of responsibility that Berhane had in relation to her co-conspirators, and to deter Berhane and others like her.

## **BACKGROUND**

By now the Court is well-acquainted with the facts of this case. For three years, Berhane was the nerve center of a carding fraud and money laundering ring involving the Caffe Aficionado coffee shop in Arlington. PSR at ¶ 8. What the conspiracy lacked in manpower – it had just four identified members, including Berhane – it made up in work ethic and skill.

Berhane's carding operation was streamlined and efficient. Berhane obtained the card numbers online, transferred them to Co-Conspirator 1 ("CC-1") for card-making, and then distributed them to Tiffany Younger and Keith Lemons. PSR at ¶¶ 9-10. The timeframe for purchasing card numbers, turning them into cards, and cashing them out was short, since stolen card numbers usually only work for a few days before they are deactivated due to fraud alerts. Berhane would distribute multiple fake cards to Younger and Lemons at a time, who would then then test and use them to make fraudulent purchases. For some fraudulent purchases, Berhane, Younger, Lemons, and CC-1 would return the merchandise and redirect the refunds to a bank account controlled by the conspiracy. In return for their services, Younger and Lemons would be

2

allowed to keep some of the fraudulently purchased items or be paid in cash. After usage, the cards would be returned to Berhane, where they would be discarded or shredded. PSR at ¶ 40.

Berhane's Caffe Aficionado was a platform designed to provide legitimacy for her criminality. She and CC-1 would purchase card numbers from the internet and store them in pseudonymous email accounts (the "whitemolecules" account, which was used by Berhane, and the "1berrybottle" and "berrybottle111" accounts, which were used by CC-1). PSR at ¶¶ 48-49. Investigators recovered thousands of stolen credit card numbers and matching personal identifying information from those accounts. CC-1 made fake credit cards using the numbers and Berhane, CC-1, Younger, and Lemons used them to buy things. PSR at ¶¶ 20-32, 35-37. Berhane fraudulently purchased gift cards to be redeemed through Caffe Aficionado's point of sale system. Berhane used her control of Caffe Aficionado to distance herself from transactions, which sets her apart from ordinary criminals, who must take the risk of appearing in person at a merchant where they can be captured on video. PSR at ¶ 54. But there was no video surveillance system at Caffe Aficionado, and in many instances Berhane swiped the cards herself or used an employee of the café to do so. Berhane also used CC-1, Younger, and Lemons to return fraudulently purchased merchandise, thereby protecting herself from detection and identification.

A large proportion of Caffe Aficionado's revenue was nothing more than the laundering of fraud proceeds. The evidence at trial indicated, as noted by the PSR, that 98% of the American Express gift card redemptions at the café were in whole-dollar increments of $5 and over $50, for a total of approximately $131,163 between June 27, 2013 (almost four months prior to the October 2013 opening) and September 7, 2014. PSR at ¶ 17. Given how unlikely it is to spend exact whole-dollar amounts at a coffee shop, let alone more than $50 in a single trip, this pattern was one of many clear indicia of fraud.

3

But it wasn't enough for Berhane to simply steal from others and launder the proceeds; she lied to the Arlington County tax authorities to save herself several months of taxes. PSR at ¶ 16. The conspiracy racked up hundreds of thousands of dollars of specifically documented losses with a higher estimated actual and intended losses. And as further discussed below, a reasonable estimate of the losses resulting from the scheme far exceeds the losses provable through the readily available records.

The café itself was financed through fraud. In a Small Business Administration ("SBA") loan package submitted to Eagle Bank on August 8, 2012, and an undated financial statement signed by Berhane, Berhane lied about her financial situation in at least one of those documents and probably in both. *Compare* Government's Trial Exhibit (hereafter "GX") 9-20 at 2 (email from June 15, 2012, stating total assets of more than $1 million in undated email attachment) *with* GX 9-21 at 5-6 (email from August 8, 2012, from SBA loan application stating total assets of $713,553). The government does not have contemporaneous evidence demonstrating Berhane's true financial condition at the time the statements were signed.[1] But given how different the 2012 statements are from one another, the fact that Berhane reported only modest employment in the preceding years, PSR at ¶¶ 117-26, and that the forms were separated by less than two months, and the fact that she checked the box saying that she had never been convicted of or charged with a crime, neither financial statement is likely to be a truthful statement her of wealth at either time.

Moreover, much of the information contained in the undated financial statement in the June 15, 2012 email is highly suspect, including the assertion (which until recently appeared on her

---

[1] The government also lacks evidence of the defendant's present financial condition, as the evidence in the case relates to the time period surrounding the conduct charged in the Indictment (early 2017). And the credit reporting available to the Probation Office includes no asset information. *See* PSR at ¶ 126.

public LinkedIn profile),[2] that she had worked at "Samuel Media" in "branding" for nearly 12 years prior to starting the café in 2013. This purportedly continuous 12-year period of employment encompasses Berhane's commission of some of her earlier credit card fraud crimes and her prison sentence for the 2003 access-device-fraud conviction in the Southern District of New York. PSR at ¶ 83.

## THE GUIDELINES

### A.    The PSR Largely Correctly Calculated the Specific Offense Characteristics.

There is no plea agreement resolving disputes as to the Guidelines in this case. According to the revised PSR, the defendant's total offense level is 31, PSR at ¶ 78, and the defendant's criminal history category is IV, PSR at ¶ 130, resulting in a Guidelines sentence of 151 to 188 months. PSR at ¶ 130. The PSR properly applied a two-level enhancement because the offense involved 10 or more victims under U.S.S.G. § 2B1.1(b)(2)(A)(i), a two-level adjustment for serving as an organizer, leader, manager, or supervisor under U.S.S.G. § 3B1.1(c), a two-level adjustment for obstruction of justice under U.S.S.G. § 3C1.1, and a two-level enhancement for sophisticated means under § 2B1.1(b)(10)(C). PSR at ¶¶ 54–58, 63–67.[3] The Guidelines are correctly calculated in the PSR, with the following exception.

Berhane's conduct warrants an additional two-level enhancement under U.S.S.G. § 2B1.1(b)(11)(A)(i) and (b)(11)(B)(i) because it involved device-making equipment. This enhancement, which is triggered by "(A) the possession or use of any (i) device-making

---

[2] As of March 8, 2023, the LinkedIn page for Berhane appears to have been scrubbed of any reference to Caffe Aficionado and only lists "Samuel Media" with no date range.

[3] Notably, Berhane does not object to the application of the first two enhancements. The defense's position on the third is currently unknown as the defense has not had an opportunity to object since the addendum to the PSR was filed.

equipment, or . . . (B) the production or trafficking of any (i) unauthorized access device or counterfeit access device," applies because Berhane and CC-1 possessed device-making equipment in their apartment (card printer, card encoder, and a very large card embosser) and produced and trafficked stolen credit card numbers and fake credit cards as part of the conspiracy. PSR at ¶¶ 39-40, 54.

The Probation Officer correctly noted that § 2B1.6 prevents enhancement of the offense level for the substantive offense "for the transfer, possession, or use of a means of identification" where the defendant is convicted of Aggravated Identity Theft under 18 U.S.C. § 1028A on the grounds that it would constitute double counting. PSR at 42. However, the Fourth Circuit has approved the use of specific offense enhancements under § 2B1.1(b)(11) where device-making equipment is present. *See United States v. Carver*, 916 F.3d 398, 400-01 (4th Cir. 2019) (approving device-making equipment enhancement in case with § 1028A conviction); *United States v. Damyanov*, 503 F. App'x 224, 225 (4th Cir. 2013) ("Although the exclusion language in Application Note 2 tracks the language that triggers [§ 1028A]'s consecutive term of imprisonment, ... [U.S.S.G.] § 2B1.6 does not exclude all conduct described in U.S.S.G. § 2B1.1(b)(11)." (internal quotations omitted)) (citing *United States v. Jenkins-Watts*, 574 F.3d 950, 962 (8th Cir. 2009)). As such, adding two points for conduct like possession of device-making equipment that is not the "transfer, possession, or use of a means of identification" is proper and Berhane's total offense level should be two levels higher than what the PSR calculated.

The parties differ, however, as to the loss calculation and its effect on the calculation of the offense level.

**B.      The Loss Amount is Properly Calculated as $1.5 Million to $3.5 Million.**

The defendant received a 16-point loss enhancement based on § 2B1.1, Application Note 3(F), which sets out a Special Rule ("Special Rule") establishing a minimum estimate of loss for credit card fraud cases at $500 per access device (such as a stolen card number). Multiplying $500 by the 3,756 stolen card numbers identified in email accounts, electronic devices, receipts, and records relating to the conspiracy's activities, the Probation Office calculated a loss amount between $1.5 million and $3.5 million, and thus applied a 16-level enhancement. U.S.S.G. § 2B1.1(b)(1)(I); PSR at ¶ 51.

The defendant objects to this loss calculation, maintaining that the Guidelines loss amount should the same as the victims' reported restitution amount. PSR at ¶ 43. For the reasons explained below, this Court should continue to calculate loss by applying the Special Rule after *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). Failing that, this Court should calculate loss by reference to the intended loss from this fraud scheme. If the Court disagrees with both of those options, then it should calculate loss by estimating the actual loss. A reasonable estimate of actual loss in this case is significantly higher than the restitution amount.

### 1.      Credit Card Fraud Loss Generally

Amount of loss is a question of fact and need only be a reasonable estimate. *See United States v. Mehta*, 594 F.3d 277, 282 (4th Cir. 2010) ("The amount of tax loss is not always a precise figure[.]"); *United States v. Squirrel*, 588 F.3d 207, 212-18 (4th Cir. 2009) (contrasting loss calculations under the Mandatory Victims Restitution Act (MVRA) and Guidelines); *United States v. Conner*, 262 F. App'x 515, 519 (4th Cir. 2008) ("Extrapolation is an acceptable method to use in making a reasonable estimate of the amount of loss under the sentencing guidelines.") (citing *United States v. Pierce*, 409 F.3d 228, 234 (4th Cir. 2005) (upholding calculation of fraud loss by

extrapolation from the monthly averages for one period of years to another)); *United States v. Schmuckler*, 911 F. Supp. 2d 362, 371-73 (E.D. Va. 2012) (Brinkema, J.) (examining relationship between loss calculations under MVRA and Guidelines; *see also* U.S.S.G. § 2B1.1, Application Note 3(C) ("The court need only make a reasonable estimate of the loss. The sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence. For this reason, the court's loss determination is entitled to appropriate deference.").

The Guidelines loss estimation rules embody "an important principle underlying the Guidelines, namely matching punishment with culpability." *United States v. Miller*, 316 F.3d 495, 502-03 (4th Cir. 2003); *see* U.S.S.G. ch. 1, pt. A(3) ("Congress sought proportionality in sentencing through a system that imposes appropriately different sentences for criminal conduct of differing severity."); *United States v. Williams*, 81 F.3d 1321, 1327-28 (4th Cir. 1996) (it is "clear as a general matter that a fraud can be complete without ultimately inflicting the full, intended loss on the victim"). This is consistent with "pre-guideline practice" in which "the amount of the loss and the nature of the conduct—i.e., whether the offense consisted of an isolated crime of opportunity as opposed to one that was sophisticated or repeated—were considered the two most significant factors in determining the length of the sentence imposed." *United States v. Marcus*, 82 F.3d 606, 608 (4th Cir. 1996).

Perfection is just as difficult in credit-card-fraud cases, if not more so, than in other types of fraud cases. First, credit-card-fraud cases often involve defendants who, like Berhane, possess large numbers of stolen credit-card numbers issued by dozens of financial institutions, and in this case 97 of them. As in this case, stolen credit-card numbers bought on the internet usually only work for a few days at a time before the banks deactivate them for fraud, so people who purchase stolen card numbers for fraud discard or destroy evidence frequently. Here, there was trial

testimony that the conspirators returned their fraud cards to Berhane or disposed of the cards elsewhere, and there were bags of shredded cards that investigators found in Berhane and CC-1's apartment.

Second, it is often easy to determine *whether* a particular defendant has committed prolific credit card fraud, but there is exponentially more difficulty in determining *how much*. Berhane and her co-conspirators committed fraud at hundreds of different stores over more than a three-year period. The sheer scale of that kind of criminality exponentially increases the difficulty in collecting records, assuming they still exist when investigators collect them. Investigators must collect financial records from numerous entities, reconcile records from different recordkeeping systems, and match them to other records. "These crimes require time and expertise to investigate and can be difficult to unravel and prove." *Carver*, 916 F.3d at 404. But merchant surveillance video is often available only for a short time and has been overwritten or deleted by the time investigators try to obtain it. As such, the estimate of loss in a case like this one nearly always underestimates the actual scope of the defendant's activity, as further explained in the next section.

### 2.    Estimating the Number of Cards Used in This Case

There is strong reason to believe that the count of 3,756 stolen card numbers (which is the basis for the Probation Office's loss estimate in this case) is a conservative estimate of the stolen card numbers that Berhane and her co-conspirators obtained and used. This means that the Probation Office's estimate of a $1,878,000 loss based on the Special Rule is likewise conservative.

Trial evidence showed Berhane committing card fraud and related conspiracy activity continuously from 2013 (and actually earlier), throughout 2015, through her arrest in 2016. Berhane discussed fraud with Lemons as early as 2015. GX 14-7 at 4. Task Force Officer (TFO)

John Bamford recovered stolen card numbers used in 2015 from retailers (including approximately 1,000 unique masked card numbers obtained from Safeway records that are *not* represented in the 3,756 card count) and from victims. Yet TFO Bamford was able to identify only a few stolen card numbers from 2015 in the email accounts, computers, and other electronic devices searched in this case, which is where most other card numbers were found.[4] Many more cards were used by the conspiracy in 2015 and are not represented in the 3,756 number. The Federal Bureau of Investigation ("FBI") forensic accountant's time chart showing American Express gift card usage at Caffe Aficionado from mid-2013 to mid-2016 shows suspicious gift card activity at the café escalating through 2014, with the highest volume of suspicious gift card activity taking place in the first two quarters of 2015. *See* GX 5-3.

The Court can reasonably conclude that Berhane and her conspirators used numerous additional cards that have not been positively identified, that the card count and the restitution amount significantly underestimate the number of cards possessed and used by the conspiracy, and therefore that the actual and intended losses of the conspiracy (which include declined card numbers and card numbers procured but never used) are likely far higher.

### 3.    This Court Should Apply the $500-Per-Card Special Rule.

The Special Rule is categorically reasonable for this type of case because of the difficulties in accounting for the full scope of the defendant's bad conduct, no matter how overwhelming and

---

[4] The most likely explanation for the disparity between 2015 and other years is that the stolen card numbers had been stored on a Sony laptop found in Berhane's apartment that malfunctioned and could not be processed when forensic examiners attempted to analyze it. The laptop is pictured in some of the photographs recovered from the defendant's iPhone, *see, e.g.*, GX 14-15, GX 14-19, and GX 14-22, which show card numbers on the laptop's screen and the apartment's curtains in the background. Investigators cannot be sure where the 2015 card numbers were stored. But this also means that the United States' calculation of the number of stolen cards is conservative.

voluminous the other evidence of guilt. *See* U.S.S.G. App. C, Amendment 596 (Nov. 1, 2000), 65 Fed. Reg. 26,880, 26,895 (May 9, 2000). This is precisely what the Commission had considered when adopting the $500-per-access-device minimum, noting that it was responding to legislative directives to

> assess certain specific factors in its consideration of appropriate penalties for identity theft, including: the number of victims; the harm to a victim's reputation and inconvenience caused by the offense; the number of means of identification, identification documents, or false identification documents involved in the offense; the range of offense conduct; and, the adequacy of the value of loss to an individual victim as a measure for establishing penalties.

*Id.*; Identity Theft and Assumption Deterrence Act of 1998, Pub. L. 105–318(b)(1). Based on that analysis, "the Commission's research and data supported increasing the minimum loss amount, previously provided only in §2B1.1 (Larceny, Embezzlement, and Other Forms of Theft), from $100 to $500 per access device." 65 Fed. Reg. 26,895.

Moreover, Fourth Circuit rulings on the Special Rule, "both before and after the Supreme Court's decision in *Kisor*," routinely "deferred to and relied on those commentary definitions in reviewing challenges to loss calculations under § 2B1.1." *United States v. Limbaugh*, No. 21-4449, 2023 WL 119577, at *4 (4th Cir. Jan. 6, 2023) (unreported) (approving use of Special Rule under plain error review); *United States v. Graves*, No. 21-4256, 2022 WL 1073863, at *2 (4th Cir. Apr. 11, 2022) (per curiam) (unpublished) (applying intended loss guideline).

The defendant's objections to using the Special Rule are meritless. As an initial matter, the defendant's objection to the Probation Office's use of the Special Rule on the grounds that "intended loss" is not a legitimate basis for a loss calculation under U.S.S.G. § 2B1.1, *see* PSR at 43, is misplaced. The Special Rule does not use the term "intended loss" at all, so the objection misconstrues the basis for the $500 minimum estimate.

In any event, the Fourth Circuit has repeatedly entertained and rejected attacks on "intended loss" as a category under the Guidelines. *United States v. Miller*, 316 F.3d 495,499-500 (4th Cir. 2003) (collecting cases). It is not hard to see why. "[L]imiting intended loss to that which was likely or possible . . . would eliminate the distinction between a defendant whose only ambition was to make some pocket change and one who plotted a million-dollar fraud." *Id.* at 503 (quoting *United States v. Studevent*, 116 F.3d 1559, 1563 (D.C. Cir. 1997)).

The defense objection to the PSR also cited *Kisor v. Wilkie*, 139 S. Ct. 2400 (2019) to suggest that the Guidelines application notes, which set forth the Special Rule, have less status than the text of the rule. This is wrong. *Kisor* does not apply to the Special Rule at all. The $500-per-card minimum loss amount was promulgated by notice and comment rulemaking, 65 Fed. Reg. 26,880, 26,895 (May 9, 2000); 65 Fed. Reg. 2663, 2668 (Jan. 18, 2000), and therefore is itself the "regulation" to be interpreted, not just the Sentencing Commission's interpretation of the regulation. *See United States v. Dupree*, 57 F.4th 1269, 1280 (11th Cir. 2023) (en banc) (Pryor, C.J., concurring) (noting that "[u]nlike most agency interpretive rules, Guidelines commentary ordinarily goes through the same notice-and-comment and congressional review procedures as substantive guideline revisions," and arguing that *Kisor* deference does not apply to rules that go through notice and comment).

Should the Court ultimately determine that *Kisor* does apply to the Special Rule as an interpretation of some other agency regulation, the rule survives *Kisor* deference, and the Court should apply the Special Rule anyway. The approach set forth in *United States v. Phillips*, 54 F.4th 374 (6th Cir. 2022) is instructive. There, the Sixth Circuit recognized that deference under *Kisor* has two steps, namely: (1) determining whether the Guideline is genuinely ambiguous after resorting to all the standard tools of interpretation; and (2) if so, deferring to the agency's

reasonable interpretation of the Guideline where it is the official position of the Commission, implicates its substantive expertise, and reflects fair and considered judgment. *Phillips*, 54 F.4th at 380. All of those things are true of the Special Rule.

First, the term "loss" as used in U.S.S.G. § 2B1.1 is genuinely ambiguous. As the Sixth Circuit recognized, a consultation of various dictionary definitions of the word "show that 'loss' can mean different things in different contexts." *United States v. Riccardi*, 989 F.3d 476, 486 (6th Cir. 2022) (gift card case). Indeed, "[e]ven in the economic realm, the word might cover only the precise value of, say, a gift card that is stolen … [o]r it might include the costs associated with obtaining a replacement gift card, including the time and expense from a second trip to the store." *Id.*; *but see United States v. Banks*, 55 F.4th 246, 258 (3d Cir. 2022) (concluding that "in the context of a sentence enhancement for basic economic offenses, the ordinary meaning of the word 'loss' is the loss the victim actually suffered.").[5]

The next question is then whether the Special Rule is within the "zone of ambiguity" generated by § 2B1.1, relying on text, structure, and history. *Phillips*, 54 F.4th at 384. As described above, the Special Rule was conceived and promulgated at legislative direction in recognition of the immense difficulties in accurately calculating loss in sophisticated fraud schemes like this one. The Sentencing Commission attempted to balance various factors related to punishment, matters indisputably within its substantive expertise, as well as empirical data about identity theft. This is an appropriate basis for deference. And like the number of "images" in a child pornography video, the amount of "loss" from a stolen credit card "is not a question that can be answered without

---

[5] True, the *Riccardi* court ultimately held that it "need not decide whether one clear meaning of the word 'loss' emerges from the potential options," *id.*, but its analysis and the illustrative examples the court generated make clear that the term is genuinely ambiguous in this context.

making some sort of interpretation." *Id.* at 385. Like the number of "images" in a video, the number could be small or in some videos, in the hundreds of thousands or millions. It does not have only one reasonable meaning. "Loss" could include loss to the bank, incidental losses borne by a victim of the identity theft, expected consequential losses, pecuniary or intangible losses, intended loss from a failed attempt, and so on. In that context the Commission, "in direct response to the challenges," *see id.*, promulgated the Special Rule setting the threshold at $500 per card.

*Riccardi* incorrectly rejected deference to the Special Rule. *See* 989 F.3d at 486 (holding that "the commentary's $500 minimum loss amount for gift cards does not fall 'within the zone of [any] ambiguity' in this guideline"). In supporting its conclusion, the court stated that "[n]o reasonable person would define the 'loss' from a stolen gift card as an automatic $500," and found that the case before it "proves the point" because there the stolen gift cards had "an average value of about $35." But this analysis completely ignores the Sentencing Commission's legitimate prerogatives to promulgate administrable rules that properly capture harms in complex cases and facilitate the need to arrive at a reasonable estimate of the loss. And the persuasive force of the disconnect between the $500-per-card rule is much diminished here compared to *Riccardi*: here, the average loss from each used card was in excess of $500, and the average loss from all cards was well above the $35 at issue in *Riccardi.*

Moreover, the same circuit in *Phillips* appears to have severely limited *Riccardi*'s rejection of bright-line, numbers-based Guidelines commentary by explicitly endorsing the 75:1 rule regarding child-sex-abuse imagery. *United States v. Phillips*, 54 F.4th 374, 385 (6th Cir. 2022); *see also id.* (noting that the court did "not … understand *Riccardi* to mean that the Commission cannot be interpreting within the zone of ambiguity any time it uses a numerical approximation"). The 75:1 rule, like the $500-per-card rule, automatically attributes a certain numerical value to a

14

piece of contraband in order to arrive at an appropriate estimate of harm. While the *Phillips* court attempted to distinguish the 75:1 rule from the $500 rule in an apparent effort to not overrule *Riccardi*, there is not much daylight between the two concepts when it comes to assessing whether the use of a bright-line rule constitutes a proper interpretation of an ambiguous term in the Guidelines. This Court should follow *Phillips* and hold that the use of the Special Rule is a proper exercise of agency interpretation within the some of ambiguity, akin to the 75:1 rule.

### 4.      If the Court Rejects the Special Rule, Then it Should Apply Intended Loss.

If this Court finds that the Special Rule is invalid under *Kisor*, then it should estimate the intended loss from the fraud scheme. The Guidelines plainly contemplate "intended loss," and not just in the application notes. U.S.S.G. § 1B1.3(a)(3) puts *intended* harm on the same footing as *actual* harm, sweeping in as relevant conduct "(3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, **and all harm that was the object of such acts and omissions**[.]" U.S.S.G. § 1B1.3(a)(3) (emphasis added). That is consistent with the rule for attempts set forth in U.S.S.G. § 2X1.1(b), which adjusts offense levels under circumstances not relevant to this case. This understanding of "intended loss" as a legitimate category is also consistent with ordinary grammar, in which the qualifier "intended" narrows the broader and more general term "loss," and does not carry a meaning that transforms "intended loss" into something that is not "loss." And, applying a similar framework as the above, using intended loss survives *Kisor* deference. Even if this court were to disagree that a $500-per-card falls within the Commission's zone of ambiguity, using intended loss to calculate loss certainly does.

15

Here, while it is difficult to put a precise figure on the loss Berhane intended through her fraudulent conduct, it is clear that it is greater than $550,000. The restitution figure[6] only accounts for times when Berhane successfully defrauded an entity. But her successes were just the tip of the iceberg compared to her total criminal activity. Berhane and her associates tried and failed on numerous occasions to purchase items with stolen card numbers, and also failed numerous times to return the fraudulently purchased items and divert the funds into accounts controlled by her. And this is to say nothing of all of the times she tried to use a stolen card, only to learn that it had already been deactivated. And had she not been stopped by being arrested, the scheme may have continued undeterred for even longer. In short, whatever the ultimate figure would have been, it is clear that Berhane intended to create losses well in excess of the restitution amount. Using intended loss above $550,000 leads to a 14-level increase in Berhane's offense level, yielding a total offense level of 31 and a range of 151 to 188 months of incarceration (if the Court grants the two-level enhancement for device-making equipment).

## 5.  If the Court Rejects Both the Special Rule and Intended Loss, Then It Must Estimate Actual Loss.

The restitution figure significantly underestimates actual loss here. Recall that of the approximately 97 banks from which investigators recovered stolen card numbers attributable to Berhane, only five of those banks responded with loss numbers, leading to the PSR's restitution figure. Accordingly, it is necessary also to estimate the losses from the 92 banks that did not report their loss figures to arrive at an accurate estimate of the actual losses.

---

[6] As described later, the United States is providing an updated restitution number based on a restitution request from Discover. This increases the restitution amount to just below the $550,000 threshold for a two-point increase in the offense level, but does not increase the offense level or the Guidelines, nor is the change material to the government's analysis here.

The FBI's forensic accountant calculated the average loss for each card recovered from the conspiracy that had been confirmed to have sustained a loss based on records from the five banks that provided detailed records. Exhibit A, Declaration of Stephanie N. Anderson. The average loss per card from the five reporting banks for the full timeframe of relevant conduct was $315.65. This average includes many cards for which there were $0 in losses, leading to a conservative estimate of average loss per card. Assuming the average loss per card from the non-reporting banks was similar to the reporting banks, then the total loss across the 3,756 cards attributable to Berhane is $1,185,594.41. This leads to a 14-level increase in Berhane's offense level, yielding a total offense level of 31 and a range of 151 to 188 months of incarceration.

We reiterate that this is a conservative estimate of loss. There are likely many more cards attributable to Berhane beyond the 3,756 accounted for here. And the average loss per card, calculated excluding the unsuccessful cards, was $607.91. Extrapolating that average loss to the identified stolen card numbers, the estimated total loss amount is $2,283,318.44, which results in the same 16-point offense level enhancement as the application of the Special Rule. U.S.S.G. § 2B1.1(b)(1)(I). This is consistent with the profit margins that Berhane herself estimated in one of the custodial interviews (where she repeatedly minimized her conduct), saying that each card generated $300 to $800. GX 4-8T at 1 ("But, you know, now yo- it's a 300, 400, you know, 800, if you're lucky, purchase, it's uh you know. The margins are smaller there too, you know, crime pays even less now.")

At bottom, the parties agree on Berhane's criminal history category and most aspects of the offense-level calculation. If the Court fully agrees with the government's view of the guidelines, then defendant's offense level will be 33, which, combined with a criminal-history category of IV, corresponds to a range of 188–235 months of incarceration. *See* U.S.S.G § 5A

(sentencing table). If the Court agrees with the government as to all the specific offense characteristics and adjustments *except* that it chooses to use the most conservative actual-loss figure of less than $550,000, then the offense level will be 29, corresponding to a range of 121–151 months of incarceration. *See id.*

## SENTENCING RECOMMENDATION

The statutory factors justify an aggregated custodial sentence of 212 months. The Court can achieve this result by structuring the sentence so that 188 months would be imposed under Counts One through Six and Ten and Eleven running concurrently, with two years consecutive for Counts Seven, Eight, and Nine running concurrently, for a total of 212 months. The Court should also impose the maximum term of supervised release, with a special condition that the defendant be barred from employment involving financial matters, full restitution, forfeiture, including a money judgment, and statutory special assessments.

### A.    The Statutory Factors Weigh In Favor of a 212-Month Sentence

***History and characteristics.*** Berhane's criminal history is extensive, and nearly speaks for itself. But she stands out from ordinary credit card fraudsters for her relentlessness. The defendant's documented criminal history stems back to 1997 when she was 25 years old and convicted of possession of stolen property. She received five years of probation. PSR at ¶ 81. Two years later, in 1999, she was convicted of federal access device fraud based on her possession of fraudulent identification, credit cards, and checks. She was sentenced to three years of probation. PSR at ¶ 82.

None of this deterred her. In 2002, Berhane she was convicted of making false statements on credit cards and attempted theft. She received two years of probation. PSR at ¶ 83. She was also convicted in 2003 after a federal jury trial in the Southern District of New York for conspiracy to

commit access device fraud and access device fraud, having been found at a dentist's office in possession of three FedEx envelopes containing counterfeit credit cards. PSR at ¶ 84. According to a news report from the time that is consistent with public court docket records, Berhane was back at it even before she was sentenced, using a fake driver's license and credit card to rent a car. *New Bust For 70g-Fraud Shopaholic*, N.Y. Post, Mar. 29, 2003, *available at* https://nypost.com/2003/03/29/new-bust-for-70g-fraud-shopaholic/ (last accessed March 3, 2023); *United States v. Berhane*, 1:02-cr-00450-TPG (S.D.N.Y. 2003). She was sentenced to 40 months in federal prison and was placed on supervised release on March 3, 2006. PSR at ¶ 84. Emails recovered from her Yahoo account show that she obtained stolen credit card numbers again in May 2007. GX 9-3 and GX 9-4. She was apparently never detected, and this violation of her terms of supervision went undiscovered until this investigation.

On February 2, 2011, Berhane was arrested in New York County Supreme Court for criminal possession of a forged instrument 3rd degree. PSR at ¶ 85. The experience did not motivate her to seek a law-abiding life. Emails recovered from Berhane's Yahoo email account show that less than two months after the 2011 arrest, and, even before sentence had been imposed, her conduct was escalating as she pursued fake identification cards and card printing materials. *See* PSR at ¶ 85; GX 9-5, GX 9-6, GX 9-7, GX 9-15, GX 9-18 (discussing obtaining raw materials for making access devices). As the evidence at trial showed, these items or items just like them would later be used to make fake credit cards for which the proceeds of fraud would be laundered through the Caffe Aficionado platform.

**The need for the sentence to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment.** "Financial fraud is a modern scourge. It preys especially upon the unsophisticated and vulnerable." *Carver*, 916 F.3d at 404. Credit card fraud is

19

theft and the costs are ultimately borne by law-abiding cardholders. "It raises costs for businesses, which must invest in security measures." *Id.* The Government requests that the Court impose a sentence that reflects the full impact on victims, which include the victims of loss (which are typically institutions) and the individuals whose card information was stolen and used. Victims testified at trial about the inconvenience that they suffered from the fraud, including one victim whose card was deactivated while he was traveling with a family member and another while he was in the hospital for the birth of a child.

"[C]rimes like those in this case harm victims in almost irreparable ways by causing them loss of work, mental anguish, monetary loss, and loss of peace of mind." *Id.* (internal quotations omitted). Even when victims of card fraud suffer no pecuniary loss, they experience the stress of dealing with law enforcement and the courts, swearing out fraud affidavits, damaged credit scores, canceling accounts and cards, and sometimes even thoroughly auditing their own finances. Even after all that is finished, many live on for years with uncertainty and worry, unsure of how their card number was stolen and not knowing whether they will be targeted again.

But Berhane does not think these are serious crimes at all. In one of her custodial interviews, she displayed self-righteous condescension toward other criminals who steal:

> BERHANE: You work homicides.
>
> JOHNSON: No no no, we're we're beyond that. I've done that, but um no, we're I work burglaries.
>
> BERHANE: Oh
>
> JOHNSON: You aren't breaking to people's homes and getting these things, are ya? So, this is more of an education for us.
>
> BERHANE: I guess you shouldn't judge people, but you know, that sounds horrific going to someone's house.

GX 4-7T at 6.

Berhane commits credit card fraud because she collects luxury goods that would be unattainable (at least legally) for someone of modest means. *See* ARLnow.com, New Rosslyn Coffee Shop to Open Next Month, *available at* https://www.arlnow.com/2013/09/12/new-rosslyn-coffee-shop-to-open-next-month/ ("'I used to like to collect purses and stuff,' [Berhane] said. 'Now that I own a coffee shop, I like to collect equipment.'") (last visited Mar. 6, 2023). The government seized numerous bags, jackets, and purses when searching Berhane's penthouse apartment in 2016 (although they were not admitted into evidence at trial). The brands included familiar designers like Gucci, Saint Laurent, Louis Vuitton, Chanel, Fendi, and Prada. Berhane's penthouse apartment itself was obviously quite luxurious and costly, even though Berhane told investigators, "[T]his is the most badly I've ever lived in life. You know, crime, this crime doesn't pay." GX 4-7T at 4.

More than anything else, Berhane's criminality manifests selfishness and indifference to those outside of her circle. The Court should therefore impose a significant period of imprisonment that accurately reflects the magnitude of her crimes.

*The need to deter the defendant, to protect the public from further crimes of the defendant, and to provide the defendant with treatment.* This factor requires the Court to consider (1) the need for specific and general deterrence, (2) to protect the public from further crimes, and (3) to provide treatment. The second factor predominates here.

Protection of the public, or incapacitation, is the government's most serious concern about Berhane. The sad reality is that she will likely never stop committing credit card fraud. She has spent the last 30 years committing it, often while under court supervision. Nor is it likely that rehabilitation in prison or on supervised release will be effective.

As to specific deterrence, Berhane needs to hear a very loud deterrent message from the Court. The Court can also advance the cause of general deterrence by sending that loud deterrent message to others who may be inclined to get into a life of credit card fraud. Thus, these factors weigh in favor of a 212-month term of imprisonment that far exceeds the longest of Berhane's previous sentences, which was the 40-month sentence imposed on her in New York nearly 20 years ago.

***The need to avoid unwarranted sentencing disparities.*** A substantial sentence would also avoid unwarranted disparities and be sufficient but not greater than necessary to accord with the purposes of sentencing under 18 U.S.C. § 3553(a). CC-1, as the PSR notes, received a total of 25 years of imprisonment, 11 of which were suspended. PSR at ¶ 7. This resulted in a 14-year executed term. CC-1's criminal history was significant, but most arrests and convictions were from the early 1990s. Berhane has a more recent criminal history, and was brazen in repeatedly committing fraud crimes and violations of supervision.

Berhane clearly administered the conspiracy to a significant degree, serving as the nerve center. Evidence at trial showed that Berhane directed Younger and Lemons, both in where and how they would return items, make fraudulent purchases, and how to do so. Berhane, not Younger or Lemons, knew the profit margins and how to obtain card numbers. Berhane handled the distribution of the cards from CC-1 to Younger and Lemons and compensated them for their involvement. Berhane also laundered the funds through Caffe Aficionado. A total of 212 months for Berhane is reasonable, as the defendant was at least as culpable as CC-1, who received effectively 166 months.

As the above discussion makes apparent, the statutory factors strongly favor a significant sentence, just as does the advisory guidelines range. Many of the most salient sentencing factors—

22

defendant's criminal history and repeated similar misconduct, her role as the leader of this fraudulent operation, the sophistication of the operation—are independent of how one defines or calculates "loss." While the advisory guidelines are an important touchstone for this Court's sentencing determination, in this case the § 3553(a) factors support the government's recommendation under both competing loss-amount calculations. Moreover, the recommended sentence does not represent a large variance from either range: a Guidelines sentence of 188 months is only 37 months above the top of the range generated by using "actual loss," and is at the bottom of the range generated by the loss estimate advocated by the government.

**Supervised Release.** The Court must also determine the appropriate term of supervised release at sentencing. "Supervised release . . . is not a punishment in lieu of incarceration." *United States v. Granderson*, 511 U.S. 39, 50 (1994). Instead, it "fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000). For the reasons described above, the United States requests that the Court impose the maximum term of supervised release as to each count. The United States has grave doubts that the defendant will avail herself of the "rehabilitative ends" and resources offered by supervised release, but the public interest demands that the Court maintain the ability to manage her return to life outside of prison and ensure that she cannot further victimize the public.

The United States also has concerns about Berhane's continued involvement[7] in the pursuit of government loans. PSR at ¶ 116. Given her apparent SBA loan fraud in connection with the café and her history of disregarding supervision, she simply cannot be trusted. She should not be

---

[7] It is surprising that Berhane has been entrusted with a role serving as a CARES Act coordinator and public health grant consultant during the pendency of this case. PSR at ¶ 116. There is no question that Berhane is, to quote the executive director of her present employer, "very resourceful," as that phrase also accurately describes her approach to committing credit card fraud.

involved in any way, directly or indirectly, with financial matters. And she is skilled in avoiding fraud detection systems. Accordingly, the government requests a special condition of supervision that she not be permitted to work in any position where she might be involved in obtaining or administering funds, or advising others on how to obtain funds, including government loans.

**Restitution.** Pursuant to 18 U.S.C. § 3663, the defendant must pay restitution in the "full amount of the victims' losses." During finalization of this position paper, the United States determined that Discover had sent a restitution request calculating its total loss from the fraud as $22,522.78 as of March 2022. This increases the restitution amount to $549,552.68. The United States will provide a proposed restitution order to be presented at sentencing. PSR at ¶ 130. No individual victims have submitted requests for restitution at this time, but should they do so, the United States will present them to the Court.

**Forfeiture.** The United States and the defendant entered an agreed waiver of jury trial on the forfeiture of certain electronic items. ECF No. 100. As set forth in the accompanying motion for a preliminary order of forfeiture, ECF No. 108, the United States requests that the Court order that certain consumer goods, device-making equipment, and coffee shop equipment be forfeited as part of the judgment in this case. *See* PSR at ¶¶ 39-40. The United States also requests a money judgment as further described in the motion for a preliminary order of forfeiture.

**Mandatory Special Assessment.** The United States respectfully requests that the Court impose the combined $1,100 in mandatory special assessments for the defendant's convictions, all pursuant to 18 U.S.C. § 3013.

<u>**CONCLUSION**</u>

For the foregoing reasons, the United States respectfully requests that the Court impose a term of incarceration aggregating 212 months, the maximum term of supervised release for each

count with a special condition restricting her employment to non-financial matters, full restitution,

forfeiture and a money judgment, and a $100 special assessment for each count.

<div style="margin-left: 40%;">

Respectfully Submitted,

Jessica D. Aber
United States Attorney

By:    _____/s/_____

Jonathan S. Keim
Bibeane Metsch
Assistant United States Attorneys
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: jonathan.keim@usdoj.gov

</div>

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 8, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing ("NEF") to counsel of record in this case.

I further certify that on March 8, 2023, I sent a copy of the foregoing via electronic mail to counsel of record and the U.S. Probation Officer assigned to this matter:

Kelly Smihal
Senior United States Probation Office
Email: Kelly_Smihal@vaep.uscourts.gov


By:      _____/s/_____
Jonathan Keim
Assistant United States Attorney
United States Attorney's Office
2100 Jamieson Avenue
Alexandria, Virginia 22314
Phone: (703) 299-3700
Fax: (703) 299-3981
Email: jonathan.keim@usdoj.gov